WING & EVANS v. HARTUPEE et al.

(Circuit Court of Appeals, Third Circuit. May 29, 1903.)

No. 35.

1. TRUSTEE—DISQUALIFICATION TO PURCHASE TRUST PROPERTY.

So long as the legal title to trust property remains in the trustee, he is disabled from acquiring that title for himself; and where one of two persons, who, as trustees, sold certain stock owned by a corporation, several months afterward, but before the stock had been transferred to the purchaser, bought a portion of it from him, and had the shares transferred directly to himself, he may be required to account for any profit made thereon to the corporation or its creditors, regardless of the good faith of the transaction.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

George E. Shaw, for appellants.

Boyd Crumrine, for appellees.

Before GRAY, Circuit Judge, and BRADFORD and McPHERSON, District Judges.

J. B. McPHERSON, District Judge. This is a suit in equity brought by a judgment creditor of the Charleroi Plate Glass Company to compel William D. Hartupee and George W. Crouse to account, inter alia, for the value of certain shares of stock of the Pittsburgh Plate Glass Company. Other questions were also raised in the court below, but no other need be considered here. The facts, which are not in dispute, are so clearly stated by the learned circuit judge that we reproduce nearly all his opinion from the report in 112 Fed. 817 et seq.:

"The purpose of the amended bill is to charge the defendants George W. Crouse and William D. Hartupee, personally, with the plaintiffs' judgment against the Charleroi Plate Glass Company. The answers are responsive to, and in denial of, all the averments of the amended bill upon which the plaintiffs' case rests. The only witnesses examined by the plaintiffs were the two named defendants, and their testimony sustains the answers. The amended bill does not allege that the Charleroi Plate Glass Company was insolvent at the time it sold its plant and other property to the Pittsburgh Plate Glass Company, or at the time when these defendants entered upon the service of receiving and applying the stock and bonds derived from the sale. The evidence does not show such insolvency. To the contrary, it satisfactorily appears that the company was then entirely solvent. The sale was voluntary, and made because deemed by the vendor company advantageous to it. It was the confident and reasonable belief of all its directors and stockholders that, after payment of all its debts, there would remain a large surplus of the consideration realized from the sale for distribution among the stockholders. In that expectation, these defendants undertook the discharge of the duties of their appointment.

"Their appointment was in this wise: At a meeting of the board of directors of the Charleroi Plate Glass Company held March 26, 1895, the following resolution was adopted:

" 'Resolved, that the directors of this company recommend to its stockholders, at their meeting to be held this day, that a resolution be passed, appointing George W. Crouse and William D. Hartupee as trustees to receive the shares of stock in the Charleroi Plate Glass Company held by each stockholder, and make the proper exchange for the same in shares of the Pittsburgh Plate Glass Company.'

122 F.—57

"Accordingly, at a meeting of the stockholders of the Charleroi Plate Glass Company held the same day, the following resolution was adopted:

" 'Resolved, that the recommendation of the board of directors, suggesting that George W. Crouse and William D. Hartupee be appointed trustees for the transfer of stock, be approved by the stockholders, and that the stockholders of the company be instructed to place their holding of stock in the hands of said trustees, to be exchanged for their proportion of the shares of the capital stock of the Pittsburgh Plate Glass Company after the debts of the said Charleroi Plate Glass Company are paid, and that said trustees shall give each shareholder their trustees' receipt for all stock delivered to them of holdings in the Charleroi Plate Glass Company, and that each shareholder give proper receipt to said trustees for stock delivered to them of the Pittsburgh Plate Glass Company.'

"At this same meeting of the stockholders the following resolution, also, was adopted:

" 'Resolved, that in view of the sale of the property and business of this company to the Pittsburgh Plate Glass Company, with the exception of its cash, book accounts, and bills receivable, that the president be, and he is hereby, authorized and empowered with full authority to close up the affairs of the company, and make proper distribution of the remaining assets by dividends to the stockholders of the company, and that he be authorized to employ such assistance as he may deem necessary in performing these duties.'

"George W. Crouse was the president of the Charleroi Plate Glass Co., and William D. Hartupee was the secretary of the company.

"At a meeting of the board of directors of the Charleroi Plate Glass Company held on June 6, 1895, the following resolution was adopted:

" 'Resolved, whereas, the stockholders and the directors of this company did heretofore appoint George W. Crouse and W. D. Hartupee trustees to act with reference to the exchange of the stock of this company for the stock of the Pittsburgh Plate Glass Company, deliverable to this company in payment of its property; and whereas, certificates representing the stock of the Pittsburgh Plate Glass Company have been issued and delivered in part, and the residue thereof is ready for issue and delivery upon performance by this company of certain requirements respecting title or incumbrances: Therefore, resolved, that the officers of this company be, and they are hereby, authorized, empowered, and directed to transfer upon the books of the Pittsburgh Plate Glass Company to George W. Crouse and W. D. Hartupee, trustees for the Charleroi Plate Glass Company, all the stock of the Pittsburgh Plate Glass Company due or coming to this company as aforesaid, with full authority to said trustees to assign and transfer the said stock to the various persons entitled thereto through or under this company, when and as said trustees shall see fit so to do; and said trustees, pending the liquidation of the company's affairs, are authorized to pledge said stock standing in their name to secure any indebtedness that exists or that may be hereafter created.'

"Crouse and Hartupee acted under the above-quoted several resolutions adopted by the board of directors and the meeting of stockholders of the Charleroi Plate Glass Company.

"By the terms of the agreement of sale between the two plate glass companies, the amount of stock and bonds of the Pittsburgh Plate Glass Company deliverable to the Charleroi Plate Glass Company was as follows, namely: Of stock, $580,000 (par value); of bonds, $441,000. The whole thereof came into the hands of the two named defendants, and the stock and bonds were sold by them from time to time as they could find purchasers. As sales of stock and bonds were made, they were reported to the treasurer of the Charleroi Plate Glass Company, and the proceeds fully and satisfactorily accounted for to and with the company, through its treasurer. These sales resulted in a large loss upon the face value of the securities by reason of depreciation in their market value. The stock realized $324,675. The bonds realized $432,180. The entire proceeds were applied by the defendants Crouse and Hartupee to the debts of the Charleroi Plate Glass Company. Nothing was distributed to or among any of the stockholders.

"I am fully satisfied from the evidence that the defendants Crouse and Hartupee sold and disposed of all the stock and bonds intrusted to them at fair and proper sales, and for the very best obtainable prices. The charges to the contrary made in the amended bill of complaint are not sustained by the proofs. Crouse was the accommodation indorser of all the outstanding notes of the company about to be mentioned, and obviously it was his interest in his own belief to realize the utmost from the assets of the company. That he was diligent and faithful in all this business is abundantly shown.

"Was there any misapplication of the fund? The agreement of sale bound the Charleroi Plate Glass Company to convey its property to the Pittsburgh Plate Glass Company by good and sufficient deeds, free and discharged of all liens and incumbrances. Now, at the date of the agreement of sale the real estate of the Charleroi Plate Glass Company was incumbered by a mortgage of the company given to secure corporate bonds to the amount of $500,000, which were all then outstanding. Of these mortgage bonds, $31,000 had been used previously to pay a debt owing by the mortgagor company to the Charleroi Coal Co., and all the rest of the bonds were held by various banks as collateral security for the payment of corporate notes which the Charleroi Plate Glass Company had issued. These notes amounted to over $700,000, and for the payment of all of them the mortgage bonds had been pledged to the holders of these notes. In order to carry out its agreement of sale, and to obtain the consideration, it was necessary for the Charleroi Plate Glass Company to lift all these mortgage bonds, and have its mortgage satisfied. To accomplish this, the board of directors of the Charleroi Plate Glass Company passed the above-quoted resolution of June 6, 1895, and, acting under the authority thereby conferred, Crouse and Hartupee pledged the stock of the Pittsburgh Plate Glass Company to the banks to secure the corporate notes held by them, and thus, by arrangement with the banks, they were able to lift the pledged mortgage bonds.

"It is clear to me that the board of directors had lawful power to pass the resolution of June 6, 1895, and that Crouse and Hartupee were justified in acting under it in the manner in which they did. The company was then solvent, and it had not lost the right to control its affairs and dispose of its assets. The authority conferred by the resolution of June 6, 1895, upon Crouse and Hartupee, as the representatives of the company, was necessary in order to fulfill the company's obligation to its vendee, close the sale of its property, and obtain the proceeds of sale. Without the grant and exercise of that authority; these things could not have been accomplished.

"All the proceeds which Crouse and Hartupee realized from the bonds and stock placed in their hands for disposal, they applied, from time to time as received, to the payment of the corporate notes held by the banks, and for which the banks also held the pledged collaterals. Of that application the plaintiffs have no right to complain. Those notes were secured debts, first by the pledge of the mortgage bonds, and then by the authorized pledge of the stock, and they were entitled to preference. These payments had to be made to free the collaterals and enable the representatives of the company to realize the full proceeds of the sale of its property. What was done was entirely satisfactory to, and is not questioned by, the Charleroi Plate Glass Company. For the entire proceeds received by them, and the application thereof, Crouse and Hartupee accounted to the company. The complainants, in and by their bill, insist that, by virtue of the resolutions of the board of directors and the stockholders, it became the duty of Crouse and Hartupee to pay all the creditors, without distinction or preference. But as the company itself was not so bound, I am not able to see that the resolutions relied on imposed any such duty upon Crouse and Hartupee. The rule of equal or pro rata distribution, however, is altogether inapplicable here, because of the mortgage lien, and the resolution of the board of directors authorizing the pledge of the stock in order to remove that incumbrance, and thus secure to the company the fruits of its sale.

"The fund which came to the hands of Crouse and Hartupee proved to be insufficient to pay in full the corporate notes held by the banks and the accrued interest. There remained a balance of $12,000, which Crouse, as

accommodation indorser, had to pay out of his own pocket. This debt to Crouse is unpaid. There are also other unsecured debts of the company unpaid. The unpaid debts (exclusive of the plaintiff's judgment) amount to about $37,000.

"I cannot accept the view urged by the plaintiffs, that the defendant Hartupee is liable to account in respect to the stock of the Pittsburgh Plate Glass Company he bought from John Pitcairn under the circumstances about to be stated. In the fall of 1897 the market value of the stock of that company had fallen to 50 cents on the dollar. There was then in the hands of Crouse unsold $200,000 (face value) of that stock belonging to the Charleroi Plate Glass Company. Pitcairn offered for this whole block 55 cents, which was five points above the market price. Crouse accepted the offer, as the best he could do. The evidence is convincing that in this Crouse acted with good business judgment and in perfect good faith. In the circumstances then existing, he was fully justified in making this sale. The sale to Pitcairn was made in the fall of 1897, but the deliveries of the certificates extended over a considerable period, and were made from time to time, as Crouse was able to pay the company's notes and free the pledged stock. Pitcairn bought altogether for himself. Subsequently he suggested to Hartupee, who had become the chief engineer of the Pittsburgh Plate Glass Company, that it would be well for him to have a money interest in the company, and he offered to sell Hartupee $50,000 (face value) of his said stock at the same price (55 cents) he (Pitcairn) had paid. Hartupee accepted this offer, and afterwards got that amount of the stock. This transaction was honest throughout. It was not contemplated when Pitcairn made his purchase. It originated wholly with Pitcairn after his purchase. The two transactions were entirely independent of each other. Hartupee, as well as Pitcairn, acted in perfect good faith. No harm was done thereby to the Charleroi Plate Glass Company or its creditors. It is, I think, unimportant that this stock was not first formally transferred to Pitcairn, and then by him to Hartupee, but that the latter, upon orders, got old pledged certificates as they were lifted from the banks. The real transaction was a bona fide sale by Crouse to Pitcairn, and a subsequent and bona fide sale by Pitcairn to Hartupee. I am of the opinion that, upon the proofs, the transaction is unimpeachable by the plaintiffs."

It need scarcely be said that the defendant Hartupee could not have bought this stock directly from himself as trustee, except with the consent of all persons interested therein. The equitable rule that makes such a purchase voidable at the option of the cestui que trust is founded upon policy, and does not involve or compel an inquiry into the good faith of the transaction. As is well said in the American note to Fox v. Mackreth, 1 White & T. Lead. Cas. Eq. (4th Am. Ed.) 239, 240:

"It matters not that there was no fraud contemplated, and no injury done. The rule is not intended to be remedial of actual wrong, but preventive of the possibility of it. It is one of those processes, derived from the system of trusts, by which a court of chancery turns parties away from wrong, and from the power of doing wrong, by making their act instantly inure in equity to rightful purposes. The cases are uniform in declaring that it matters not how innocent and bona fide, and free from suggestion of fault, the transaction may be, * * * nor how harmless or even beneficial the interference of the trustee may have been; * * * the trustee can never, by his own act, shake off the equity of the cestui que trust to have the benefit of all that he does in the scope of the trust, and the cestui que trust may come into equity, as of course, and, without the imputation either of fraud or injury, ask for a resale of the property; and whether the property was or was not worth more than the amount of the trustee's bid is a matter which is never inquired into. * * * The sale is set aside, not because there is, but that there may not be, fraud."

There are hosts of authorities to support this proposition, but it is enough to cite the elaborately considered case of Michoud v. Girod, 45 U. S. (4 How.) 503, 11 L. Ed. 1076.

A slight extension of the rule is sufficient to cover such a case as is now presented, and, in our opinion, such an extension is justified by the same considerations of policy that moved the courts to lay down the rule originally. Where the legal title to the trust property still remains in the trustee, so that his duty of care, protection, and oversight continues, we think he should be disabled from acquiring that title for himself, even although he may have agreed to sell it to a third person, and by a subsequent contract with such person may have taken the conveyance of his equitable right. The danger in such a transaction differs little in degree from the danger that lurks in a sale directly by the trustee to himself; and the uncovering of fraud, if fraud there should be, in the formal sale and repurchase, would be nearly as difficult in the one case as in the other. Indeed, it might be more difficult, for, supposing fraud to exist, the conspirators would be likely to support it by their oaths, and the good faith of the transaction would therefore be sworn to by two false witnesses, instead of by only one. The duty of a trustee does not cease when he has made an agreement to sell the trust property. Until the contract is executed and the conveyance actually made, his obligation is not merely passive and formal, but continues to be active and imperative. He must still preserve and care for the trust estate, so that it may be forthcoming to answer the agreement; and he is bound also to be vigilant concerning the agreement itself, so that the intending purchaser may neither evade his own obligations, nor improperly increase the obligations of the trustee. So long as the agreement is executory, there is a necessary and a wholesome relation of hostility between the purchaser and the trustee, which should not be diminished, but would inevitably disappear altogether, the moment the trustee himself became interested in carrying the agreement into effect. Suppose the contract had been procured by fraudulent representations on the part of the purchaser, or that, for any other legal or equitable reason, the trustee would be not only justified in opposing, but required to oppose, its execution. Under such circumstances, he would obviously be taking a position antagonistic to his duty, if he were permitted to engage his personal interest upon the side of the purchaser. Moreover, there are such things as tacit understandings, insidious suggestions, hints that are sufficient between shrewd and unscrupulous men, that never reach the stage of agreements, and are yet of potent force and effect. It is obviously safer to disable a trustee from profiting by such undertakings, than to expose him to the temptation of misconduct that would be so difficult to expose, and to lay upon the cestui que trust a task, which would often prove to be impossible, of tracing the hidden course of an ingenious plot purposely kept vague and ill defined.

We do not question the entire honesty of the present agreements of sale and repurchase. The learned judge has found this fact to be established, and we accept his finding without reserve; but it is pertinent to point out, as an illustration of the peril involved in permitting

such a transaction to stand, that the good faith of the arrangement rests solely upon the oath of the defendant Hartupee himself. His co-trustee knew nothing more than he was told by Hartupee about the agreement with Pitcairn concerning these 700 shares. Pitcairn himself was not called to testify, and the bona fides of the transaction rests, therefore, upon the unsupported testimony of the witness who has the deepest interest to assert it. We do not deny that there is an appearance of arbitrariness in drawing the line at the passing of the legal title, disregarding what may be the real and substantial agreement; but as the rule disabling a trustee from dealing with the trust property for his own advantage is founded on policy, and not upon logic, the mere appearance of arbitrariness need not be alarming. It is a working rule that is needed—one that is convenient and safe to apply—and, after much consideration, we think the test that has been indicated, namely, whether the legal title has or has not passed, should determine what action a court of equity must take when it appears that a trustee has repurchased an interest in the trust estate from the person to whom the interest had been sold. If the legal title had not yet left the trustee, the contracts between the parties having dealt with the equitable title only, the transaction is voidable at the option of the cestui que trust, without inquiry into its good faith. If the legal title passed, however, and was then reconveyed, the question is one of fairness and good faith, to be inquired into in the light of the circumstances of the particular case.

This view is supported by Parker v. McKenna, L. R. 10 Ch. App. 96. It is unnecessary to state the complicated facts of that case, but the rule that was applied by the Court of Appeal clearly appears in the following quotation from the concurring opinion of Lord Justice Mellish, on pages 125 and 126:

"The main question appears to me to depend upon this—how far a trustee or agent for sale is precluded from purchasing from his own purchaser the property which he is intrusted to sell. In my opinion, as long as the contract remains executory, and the trustee or agent has power either to enforce it or to rescind or alter it—as long as it remains in that state he cannot repurchase the property from his own purchaser, except for the benefit of his principal. It appears to me that that necessarily follows from the established rule that he cannot purchase the property on his own account. There may, of course, be cases of agents for sale, who, when they have once made the contract, have concluded their agency, such as the case of an auctioneer. When he has knocked the estate down, and made the written contract, it may be said that his agency has terminated. I should suppose that even in that case the court would look with considerable suspicion on a repurchase by such an agent as an auctioneer from the person to whom he sold the estate, because it would always be extremely difficult to find out whether there had not been some previous concert and understanding between them. But this is not the case before us. In the case before us it is quite clear that, up to the time when the shares were actually registered in the names of bona fide purchasers from Stock, the directors had full power, on behalf of the company, either to enforce the contract against Stock, or to decline to enforce it, or they had power to modify it."

Another case in point is Cook v. Berlin Woolen Co., 43 Wis. 433. The facts in that case were briefly these: The directors of a corporation made an agreement to sell the corporate property to the superintendent. After this agreement had been signed, but before the

property was actually conveyed, two of the directors, by an agreement with the superintendent, acquired an interest in the proposed sale. It appeared in evidence, and the court found as facts, that the stockholders had duly authorized the sale; that, when the agreement to sell was made with the superintendent, there was no contract or understanding with the two directors that they should at any time thereafter acquire an interest in the property; that the sale to the superintendent was made in good faith, with no intent to defraud the stockholders; and that the price at which the property was sold was fair and adequate. In the court below the question of good faith was the determining feature, and, the fairness of the transaction having been determined in favor of the directors, the court sustained the sale. The Supreme Court of Wisconsin,. however, reversed this judgment; and, in the course of his opinion, the Chief Justice made the following remarks:

"But the counsel of the respondents contend, as already stated, that, when the conveyance in this case was made, the transaction was not really in fieri; that the sale was virtually complete by the executory contract; that the contract operated to vest the equitable estate in the superintendent, and to divest the corporation of the beneficial interest, leaving in it the mere legal title for the use of the purchaser absolutely, subject to present conveyance; that the duty of the directors to convey was merely ministerial in character, involving no control over any interest of the corporation; and that therefore the directors could properly purchase from the superintendent, and officially direct the execution of a conveyance by the corporation to the superintendent and themselves; and the learned counsel cited authorities sustaining the principle on which the proposition rests. Parker v. McKenna, L. R. 10 Ch. App. 96; Silverthorn v. McKinster, 12 Pa. 67.

"This is treading upon dangerous ground. Such a rule may be comparatively safe when, as in Silverthorn v. McKinster, there is an interval of years between the purchase from the trustee and the purchase by the trustee, with no appearance of interest of the trustee in the meantime. But when the trustee's purchase from his grantee follows closely on the executory sale of the trust estate—almost contemporaneously, as in this case—such a rule might well operate to protect collusive sales of trustees to third persons for their own benefit. The court would be disposed to adopt such a rule with great reluctance, or, adopting it, to administer it with apprehensive and jealous caution. It is strictly in violation of the general rule that one charged with a trust cannot be both vendor and purchaser; that a trustee cannot purchase from his cestui que trust. Such a transaction is essentially suspicious, essentially dangerous. * * * In this case, when the directors joined the superintendent in his purchase, the contract remained executory; and the board of directors had power—indeed, were charged with a duty—on behalf of the corporation, in proper circumstances, to enforce the contract against the superintendent, or to decline to enforce it, or to alter it, or to rescind it, as might be for the interest of the corporation. It will not do to say that there was in fact no controversy—no question of enforcing or altering or rescinding the contract. There might have been. The reports abound in controversies arising upon such executory contracts. And the principle is independent of the fact, as shown by Parker v. McKenna. It is because such questions might arise, not because they do arise, that the rule is so cautiously guarded, dangerous as it is with all caution."

In Silverthorn v. McKinster, supra, there were exceptional circumstances. The land in controversy was sold by parol in 1813 or 1814 by the executors of a decedent, and the purchaser went immediately into possession, made repairs and improvements, and erected a building upon the property. Five or six years afterward he sold

his interest, also by parol, to one of the executors, and delivered possession. This was in 1819 or 1820, and the executor retained possession unchallenged until his death, in 1846, and not until 1849 was the transaction attacked in the courts. In Painter v. Henderson, 7 Pa. 48, the legal title had passed, and was reconveyed 10 months afterward; there being no evidence that the trustee had any participation in the sale to the purchaser. The second of these cases is obviously not in point, and the first may well stand upon its own facts. So, also, may the similar case of Wortman v. Skinner, 1 Beasl. (12 N. J. Eq.) 358, where an administrator sold land in 1825, by virtue of an order of the orphans' court, to persons acting as agents for the heirs. No deed was made, the purchase money was not paid, and, the property being in very poor condition and bringing little to the estate, the administrator bought the property from the agents in 1829, and deeds were thereupon executed. The administrator went immediately into possession, but his title was not attacked until 1848—nearly 20 years thereafter.

No other relevant case has been cited, and none has been disclosed by our own investigation. On principle, however, even in the absence of authority, we should be content to put the decision on the ground already indicated. Certainly the protection of trust property from the danger of attack by its appointed guardian should be of high concern to a court of equity, and there should be no hesitation in laying down such rules as shall reduce the danger to a minimum. So far as the defendant Crouse is concerned, we do not understand that his liability to account has been seriously urged. But, in our opinion, his co-trustee, the defendant Hartupee, is bound to account in this proceeding for the profits upon the transaction already described, at least to an amount which will suffice to discharge the claim of the plaintiffs under their judgment against the Charleroi Plate Glass Company.

The decree of the circuit court must therefore be reversed, with costs to the appellants, and the case remanded, with instructions to enter a decree in accordance with this opinion.