### PLEWS v. BURRAGE.

District Court, D. Massachusetts. May 2, 1927.

No. 999.

**I. Equity ⟂409—Master's finding on conflicting evidence will not be disturbed, unless clearly wrong.**

Finding of master on conflicting evidence will not be disturbed by District Court, unless clearly wrong.

**2. Release ⟂57(2)—Evidence held to show plaintiff released rights under contract in belief he was bound to do so under option, and not because of false representations.**

In action to rescind sale or release of plaintiff's rights under contract to share profits of copper mining venture with defendant, evidence *held* to show that plaintiff executed release in belief that he was bound to do so under option previously given to third person, who turned it over to defendant, and not because of defendant's false representations respecting adventure.

**3. Fraud ⟂25—Misrepresentations inducing release, as one is legally bound to give, held not actionable.**

Where plaintiff gave valid option to third person to purchase plaintiff's rights under profit-sharing contract with defendant, and thereafter option was turned over to defendant, defendant's false representations to plaintiff respecting the adventure involved in contract, made after option was given, which representations induced plaintiff to perform option con-

tract, were not actionable, in application of rule that deception inducing person to do something he is already legally bound to do is not actionable.

**4. Contracts ⟂94(8)—That one to whom plaintiff gave option to purchase rights under contract failed to disclose facts held no ground for setting aside transaction for fraud.**

That third person, to whom plaintiff gave option to purchase his rights under profit-sharing contract for nominal price, in ignorance of fact that such rights had become very valuable, knew facts, but failed to disclose them to plaintiff, was no ground for setting aside transaction for fraud, there being no fiduciary relation between parties.

**5. Contracts ⟂94(8)—That defendant forced third person to surrender option to purchase plaintiff's rights under contract with defendant held not to make third person defendant's agent, so as to make transaction voidable by plaintiff.**

Where plaintiff gave valid option to purchase his rights under profit-sharing contract with defendant for nominal sum to R., who failed to disclose that rights had become very valuable, fact that defendant subsequently forced R. to surrender option to him *held* not to make R. defendant's agent ab initio, so as to make transaction voidable by plaintiff, because of fiduciary relation between plaintiff and defendant.

**6. Joint adventures ⟂4(1)—Defendant held entitled to acquire coadventurer's rights by exercising option given to third person, who concealed increased value of rights.**

Defendant, who was associated in a joint adventure with plaintiff, and had control of negotiations and more knowledge of facts than plaintiff, was bound merely not to use that knowledge to plaintiff's disadvantage when trading with plaintiff, but the fiduciary relation did not preclude defendant from acquiring plaintiff's interest in the adventure, by exercising option to purchase plaintiff's rights, given by plaintiff to third person, who concealed fact that rights had become very valuable, there being no trust property involved.

At Law. Action by Arthur S. Plews against Albert C. Burrage. On exceptions by plaintiff and defendant to master's report. Exceptions sustained in part, and overruled in part, master's report confirmed, as modified, and plaintiff's bill dismissed.

Whipple, Sears & Ogden, Sherman L. Whipple, and Alexander Lincoln, all of Boston, Mass., for plaintiff.

Henry W. Beal and John H. Powers, both of Boston, Mass., for Hayden, Stone & Co.

Boyd B. Jones, of Boston, Mass., for trustees.

MORTON, District Judge. The subject-matter of this litigation has been twice before the Circuit Court of Appeals. On the first occasion it was decided that Burrage

had no standing to maintain a bill in equity to enjoin the present action at law by Plews. Plews v. Burrage, 266 F. 347, 348. Thereafter elaborate pleadings were filed in this case. The plaintiff's declaration and replication and the defendant's answer, taken together, present substantially the same questions as were raised by the bill in equity. Burrage demurred to the replication upon the ground that, on the facts therein stated and admitted, the plaintiff was not entitled to recover. The questions raised by this demurrer went to the Circuit Court of Appeals, and it was held on the facts so presented (1) that the action must go forward and be tried at law; (2) that Burrage occupied a fiduciary relation towards Plews, which entitled Plews to full and frank disclosure from Burrage with respect to the matters in question; (3) that the replication stated a good case of oral and written misrepresentations and concealments practiced upon Plews by Burrage; (4) that the proceedings in the state court (Ross v. Burrage, 237 Mass. 545, 130 N. E. 80) did not bar Plews from maintaining the action; and (5), that Plews was not guilty of laches. Plews v. Burrage, 274 F. 881.

The view of the law on which the first point in the second case rested—and certain expressions in the previous opinion—has been overruled by Liberty Oil Co. v. Condon Bank, 260 U. S. 235, 43 S. Ct. 118, 67 L. Ed. 232. Both parties now agree that the issues of fraud raised by the replication are to be determined on the equity side of the court, in connection with the report of Mr. Proctor as special master, not as auditor. The other points in the second decision were not affected and constitute the law of this case. It must be borne in mind, however, that the Circuit Court of Appeals heard it on a demurrer which admitted the plaintiff's allegations of fact. While on many points the master's findings have sustained the allegations of the replication, on certain very important ones he has found against the plaintiff; so that the facts now before the court are substantially different from those before the Circuit Court of Appeals.

The present questions arise on exceptions taken by both parties to the master's report. They have been carefully considered, with the aid of unusually thorough briefs.

[1] As to the plaintiff's exceptions: The first five, the ninth, and the tenth, raise a question of fact as to alleged misrepresentations and concealments by the defendant at the interviews between him and the plaintiff in London and Paris in July, 1911. Only the two parties participated in the conversations, and each testified about them before the master. He has found that the defendant made no fraudulent concealments or representations on either occasion. The plaintiff contends that this finding is very clearly wrong, and that Plews' account of the conversation should have been accepted. There was no significant contemporaneous evidence supporting either witness. Plews' subsequent statements, which are urged by the plaintiff, are too highly self-serving to carry much weight. The master had to choose between the conflicting stories told by the opposing parties. After hearing each testify at great length, he was not persuaded that Plews' version was correct. It is a situation in which the master's findings are almost conclusive, for the simple reason that an able and fair-minded man—and the master in this case was both—is, under such circumstances, far more likely to reach a correct conclusion than anybody reading a transcript of what was said. I am by no means convinced that the master was clearly wrong. These exceptions must be overruled.

Of the defendant's exceptions, the fourth, seventh, eighth, ninth, and tenth relate to alleged misrepresentations and concealments by him, through which, after having obtained the option on the commission note, he procured the plaintiff's assignment of it in accordance with the option. They may conveniently be discussed together. In order to do so, reference to certain facts is necessary.

During the summer of 1911, Ross suggested to Burrage that he (Ross) undertake to buy out Plews, and that he could probably do so for a small sum. Burrage told him to let Plews alone; that Burrage would deal with that matter in his own way and time. Ross, however, went ahead on his own account, "without the instrumentality, knowledge, or consent" of Burrage (as the master finds), and got from Plews a written option to buy the commission note for £500. Ross paid Plews from his own funds £50 on account of the purchase price. The option was dated September 29, 1911, and ran four months. In November or December, Ross told Burrage what he had done. Burrage was much displeased, intimated that Ross had no right to get the option behind his (Burrage's) back, and dragooned Ross into turning it over to him, repaying Ross the £50 which the latter had advanced. In

February, 1912, Burrage exercised the option, paid the balance of the option price to Plews, and took from him an assignment of the commission note and a discharge of Plews' rights under it. Before doing this Burrage had written, in January, 1912, two very deceiving letters to Plews about the adventure. The master has found (a) that Plews relied on these letters in accepting the balance of payment under the option and in making the assignment under it; and (b) that they constituted fraud on the part of Burrage in getting the commission note. These findings are challenged by the exceptions under discussion on the grounds that the first finding is not warranted on any reasonable view of the evidence, and as to the second finding that misrepresentations made after the option was given were as a matter of law immaterial.

[2] As to (a): It is a question of fact, relating to Plews' state of mind, as to what influenced him in making the assignment in accordance with the option. He has stated his point of view in unmistakable terms. In July, 1914, he wrote to his counsel:

"When Burrage wrote that letter, I looked very seriously into my contract with Ross, to find out if it were binding on me, with the result that I was satisfied that, as I had accepted £50 on account, I was obliged to complete, and could not interfere in any way with Ross' contract, but I had the conviction that I had been sold, and, if I could then have legally withdrawn, I should have done so." Plaintiff's Brief, p. 8.

Again in 1916 he wrote to them:

"When Ross wrote and told me that he had handed over the benefit of his contract with me to Burrage, I felt at once that I was in the soup, whether by the collusion of Ross and Burrage, of course, I could not determine; but I was very suspicious, and I would have repudiated the bargain, if I had felt satisfied that I could do so legally." Plaintiff's Brief, p. 8.

In January, 1912, while the option was outstanding, Plews wrote to Ross:

"In view of what I have heard recently I would prefer to cancel the arrangement and to send you back your £50.

In his testimony Plews puts his attitude in much the same way:

"Q. Having parted with the note to Ross, you believed that your right to the note itself was terminated? A. Well, I believed this, that I was obliged to carry out any arrangements that Ross should

make, either with a third party or it may be even with Burrage." Plaintiff's Brief, p. 9.

Many other similar statements by the plaintiff might be referred to; his testimony on the point, taken as a whole, is clearly in accord with the foregoing quotations. It seems certain, in spite of the master's finding to the contrary, that Plews did not make his assignment of the commission note for any other reason than because he supposed that he had to do so under the option which he had given. I do not see how the English language can put such a state of mind more clearly than Plews himself has done in his evidence taken as a whole. Apparently this is felt by the plaintiff's counsel, for in his brief it is suggested that Plews completed the transaction because he did not realize "that the defendant's concealments and misrepresentations had relieved him from the obligation to perform" (page 10), which is very different from completing it because he relied on the truth and completeness of the defendant's statements.

[3] As to (b): The defendant further contends that, after Plews had given the option, he was bound to carry it out if called upon to do so; that thereafter statements as to the character of the property and the prospects of success, whether true or false, could not alter his course of action, and were therefore immaterial. It seems to me that this contention is sound. If the option to Ross was, as the master has in effect found, valid when given, what difference could it have made in Plews' subsequent conduct, if he had known the entire truth about the enterprise? The plaintiff gives no satisfactory answer to this question. An option binds the seller. This one, being valid in the hands of Ross, did not lose its validity when it came into the hands of Burrage. If Plews had refused to go on, he would have broken his contract. The plaintiff contends that Burrage's fraud deprived Plews of the opportunity to stand out against the option and decline to convey until compelled to do so. This was not deprivation of a legal right—at least not a legal right of substantial character. Deception by which a person is induced to do something which he is already legally bound to do is not actionable.

"A person induced by false representations to do an act which it was his duty to do cannot be heard to say that he was prejudiced by such false representations."

Musconetcong Iron Works v. D., L., etc., R. R. Co., 78 N. J. Law, 717, 76 A. 971, 20 Ann. Cas. 178; Stevens v. Odlin, 109 Me. 417, 84 A. 899; Story v. Conger, 36 N. Y. 673, 93 Am. Dec. 546.

These exceptions, viz. the fourth, seventh, eighth, ninth, and tenth, are sustained.

The foregoing findings and rulings appear to be decisive of the case. The foundation of the plaintiff's claim, clearly asserted in his pleadings, was that Ross, in obtaining the option, acted as *agent* for Burrage, and in dealing with the plaintiff was therefore under the same obligation that Burrage would have been to make a full and fair disclosure. This is how the Circuit Court of Appeals understood the situation. In their opinion it is said: "In September, 1911, Plews gave Ross, *who was Burrage's agent and employee* [italics mine], * * * an option to buy Plews' contract with Burrage for £500," etc. 274 F. at page 887. And again: "Ross never owned Plews' contract with Burrage. For present purposes, the option on it ran to Burrage, not to Ross." 274 F. at page 887.

[4] The master's findings that this was not the fact, and that in procuring the option Ross acted on his own account, "without the defendant's instrumentality, knowledge, or consent" (Report, p. 53), change the entire aspect of the case. Ross personally was under no duty of disclosure to the plaintiff; there was no relation of trust, confidence, or joint adventure between them. There is no finding, and no evidence, that Ross made any false representations to Plews in getting the option, or that he purported to represent the defendant in the transaction. As it now stands, the case is radically different from that presented by the pleadings on demurrer; and the difference goes to the very foundation of the suit. Between Plews and Burrage, Plews was entitled to rely on the latter's openness and good faith. If he dealt with Burrage, and was deceived in those particulars, he was entitled to rescind the transaction, because he could say, and say justly, that he had relied upon the fiduciary relation in which they stood in making his trade. With Ross, on the contrary, Plews was dealing at arm's length, with a person who stood toward him in no fiduciary or confidential relation, but in the same position, legally speaking, as any other buyer. Plews knew this, and traded on that assumption. After Plews gave the option, and accepted the first £50, his interest, practically speaking, was sold. That he chose to take this impor-

tant step with an incomplete knowledge of the facts is not ground for setting aside the transaction.

[5] The master further finds that, when Burrage took over the option from Ross, the former knew that Plews had given it without knowledge of the true situation, and that Ross had not disclosed to him material facts. As above stated, this did not amount to fraud on Ross' part, and there is no finding that Ross was guilty of any fraud whatever in getting the option. It did not come to Burrage subject to any equities of that character. The plaintiff strongly urges that when Burrage invoked the principle that Ross, being in his employ, had no right to buy the option for himself, and on that ground forced Foss to surrender it, Burrage in effect made Ross his agent ab initio in the negotiations by which it was obtained. It does not seem to me that this is a sound argument. The validity of the transaction between Plews and Ross is to be determined by the facts when it occurred. If no fraud was practiced then, and the transaction was valid when entered into, it does not become voidable when the buyer, by reason of his relation to a third party, has to turn his purchase over to him. The language of the Circuit Court of Appeals relied on by the plaintiff was used, as I have suggested, with reference to a situation essentially different from the facts now presented. The effect of the plaintiff's contentions, if sustained, is to free him entirely from his valid contract with Ross, who is not a party to this proceeding.

[6] The plaintiff further contends that, as the parties stood in a fiduciary relation to each other, Burrage had no right to acquire an interest in the enterprise adverse to his coadventurer, even though he did so under a contract with an independent third party. Cases are referred to in which it has been held that a trustee may not purchase an interest in the trust property, even from a third party to whom it has been sold (or agreed to be sold), unless the transaction has been fully completed and has become sufficiently matured, so that there is no presumptive connection between the sale and the repurchase. Williams v. Scott [1900] A. C. 499, 507; Wing & Evans v. Hartupee (C. C. A.) 122 F. 897; Parker v. McKenna, 10 Ch. 96, 125; Delves v. Gray [1902] 2 Ch. 606. I do not think that this principle covers the present situation. There was no trust property. Burrage held none for Plews, any more than Plews did for him. Both had inter-

ests in a "joint adventure," which was at that time only a plan in Burrage's mind, that he might develop a copper mine at Chuchicamata. Burrage, being in control of the negotiations to exploit this idea, had more knowledge of what was being done about it than Plews, and was bound not to use that knowledge to the disadvantage of Plews in trading with him. This was the extent of Burrage's fiduciary obligation. Burrage's title to the commission note does not rest on any conveyance which he made of Plews' property, but upon a contract which Plews himself made with a third party (Ross), and which Plews understood to be assignable to anybody, "even to (with) Burrage." (Plews' testimony.) The facts here are radically different from those in the cases just referred to.

While the matter is not of legal significance, it should perhaps be added, as bearing on the equitable aspects of the case, that the extraordinary success which the enterprise achieved appears to have been due mainly to the foresight, persistence, and ability of Burrage. Plews' contribution was rather slight. The deposit of ore to which he called Burrage's attention was widely known in the copper-mining industry. It had been worked since the days of the Incas. Duncan, Fox & Co., a reputable and powerful concern, had owned a large part of it for years without being able to do anything with it in a large way, though they had made efforts to utilize it. An elaborate investigation and report upon it had been made to them by a competent mining engineer as early as 1900, and the property had been publicly describ-

ed in the Mining Journal in 1908. (Master's report, Ex. p. 69.) As the facts here appear, it was Burrage who, believing that low-grade copper ore might be made valuable, stuck to the idea with persistence and ability, and at large expenditures of money, until he was on the way to success, and then succeeded in interesting the Guggenheims. With their experienced assistance, difficulties and obstacles which less able and resourceful persons might well have found insuperable were overcome, and the Chile Copper Company, as it now is, was established.

The remaining exceptions of both parties are immaterial to the present decision. It is, however, necessary to dispose of them in connection with the confirmation of the master's report, and also perhaps for purposes of appeal. They are all overruled, except in so far as such action is inconsistent with this opinion, and except the defendant's twelfth exception, and such others as involve the question there presented. Under Souffront v. Compagnie Des Sucreries, 217 U. S. 476, 486, 30 S. Ct. 608, 54 L. Ed. 846, Plews was, in my opinion, privy to the suit in the state court, in which, with his knowledge and assent, he appeared on the record as a party beneficially interested. To this extent the twelfth exception is sustained, and the same ruling applies to other exceptions presenting the same question.

It is unnecessary to decide the other points which have been argued, many of which are doubtful and important.

An order may be entered, confirming the master's report, as above modified, and a decree dismissing the bill, with costs.